**L. E. COPPERSMITH, INC., a/c Howard & Slocum, Inc.,**

v.

**UNITED STATES.**

**C.D. 2911; Protest No. 64/7428–76483.**

United States Customs Court,
Third Division.
March 1, 1967.

Stein & Shostak, Los Angeles, Cal. (S. Richard Shostak and Marjorie M. Shostak, Los Angeles, Cal., of counsel), for plaintiff.

Barefoot Sanders, Asst. Atty. Gen. (Arthur H. Steinberg, Trial Atty., Customs Section, Dept. of Justice), for defendant.

Before RICHARDSON and LANDIS, Judges.

LANDIS, Judge:

The protest herein involves merchandise, described on the invoice as "Acrylic Sheets 'SHINKOLITE'," which was assessed with duty at 19 cents per pound under paragraph 31(a)(1) of the Tariff Act of 1930, as modified by T.D. 55615, supplemented by T.D. 55649, as sheets of cellulose acetate in chief value of acrylic resin, by similitude, pursuant to paragraph 1559, as amended, of the said tariff act.

The classification of the merchandise is not questioned. Only the proper dutiable weight is in issue. The collector assessed specific duty on the invoiced weights "with overage," less 2 percent allowance for the weight of the polyvinyl chloride gaskets around the edges of the acrylic sheets and the masking paper applied to their surface. The gaskets and the masking paper are not in dispute and are distinct from the overage.

The plaintiff claims that the proper dutiable weights are the invoice net weights "without overage." The figures shown on the invoice were those used in liquidating the entry. They are likewise not in dispute.

The pertinent provisions of the Tariff Act of 1930, as modified, supra, under which the merchandise was classified are as follows:

| Paragraph | Description of Products | Rates of Duty | |
|---|---|---|---|
| | | A | B |
| 31(a) | Cellulose acetate, and compounds, combinations, or mixtures containing cellulose acetate: | | |
| (1) | In blocks, sheets, rods, tubes, powder, flakes, briquets, or other forms, whether or not colloided, and waste wholly or in chief value of cellulose acetate, all the foregoing not made into finished or partly finished articles: | | |
| | Wholly or in chief value of acrylic resins (not including powder or flakes .............. | 19¢ per lb. *** | |

The sole issue is whether the acrylic sheets at bar are properly dutiable on the basis of their actual net weights at the time of importation, including the overage, as assessed by the collector, or on the basis of the net weights of the acrylic sheets without overage, as claimed by the plaintiff.

The record in this case consists of the oral testimony of two witnesses and eight exhibits introduced in evidence by the plaintiff. In addition, the official papers were received in evidence without being marked.

The first witness for the plaintiff, Mr. William D. Chetwood, testified as follows:

He was president of Argo Plastics Co., a wholesale plastic distributor, selling plastic sheets, rods, tubes, and film; and had been in the business for over 10½ years. He had, prior thereto, worked for the largest plastic distributing company in the United States, the Cadillac Plastics & Chemical Co., a division of Dayco Corp. He stated that acrylic sheets were used by the aircraft industry in airplane canopies and airplane windows in passenger planes; the illuminated sign industry uses the sheets for illuminated signs; and there is a general industrial use "in a general glazing application in place of glass where there is a high breakage."

He stated that there were only four major manufacturers in the United States making the type of acrylic sheets as imported herein:

1. Rohm & Haas Co. in Philadelphia, the largest manufacturer in the United States, supplying probably 70 to 75 percent of the acrylic sheets made in the United States under the name "Plexiglas." A sample of Plexiglas, identified by the witness, was received in evidence as plaintiff's illustrative exhibit 1.

2. Cast Optics Corp. in Hackensack, N.J., which supplies 10 to 15 percent of the acrylic sheets manufactured in the United States under the name "Evr-Kleer Lucite." A sample thereof, with masking paper on the outside and with white polyvinyl chloride gaskets on the edges, identified by the witness, was received in evidence as plaintiff's illustrative exhibit 2.

3. American Cyanamid Co., which uses the trade name "Acrylite."

4. The Poly-Cast Corp.

Plaintiff's exhibit 3 is the only one representative of the imported acrylic sheets at bar, except that the sheets actually imported were of a different color, and size, and were covered with masking paper. The witness had purchased this merchandise from Iwai, New York.

The witness further testified that he had sold Plexiglas sheets for Rohm & Haas; Evr-Kleer Lucite sheets for Cast Optics; and Acrylic sheets for American Cyanamid. All three are made of the same acrylic material; the Japanese product being known as "Shinkolite," but they are all of the same basic chemical material, under the above trade names; and they have the same uses and for all practical purposes are identical. The witness stated that he had not seen the imported acrylic sheets manufactured in Japan, but had seen the domestic acrylic sheets manufactured in the United States.

In the manufacturing process, the acrylic sheets are made between two sheets of plate or machined glass kept apart with a gasket; the glass plates are placed parallel to each other, one above the other, the liquid monomer is poured into it, and it is put into an oven and "cured," i. e., the acrylic is transformed from a liquid state into a solid state. The masking paper is put on the surfaces of the sheets, after they are inspected, to prevent them from being scratched and to permit users to make layouts on the paper and to cut the acrylic sheets without marring the surfaces.

Mr. Chetwood stated that he was also familiar with the manner in which acrylic sheets are sold in the United States as a result of his experience in selling such merchandise for Cadillac Plastics and in buying and selling the material

of the other factories which he had named. In addition, he had pricelists, brochures, and other literature from these manufacturers in which they offer different sizes, colors, thicknesses, and grades of acrylic sheets.

A pricelist of Rohm & Haas Co., which Mr. Chetwood, in the ordinary course of his business of purchasing and selling Plexiglas, had obtained from Rohm & Haas, was received in evidence as plaintiff's exhibit 4. Mr. Chetwood testified that plaintiff's exhibits 5, 6, and 7 were pricelists of Cast Optics Corp., American Cyanamid Co., and Poly-Cast Corp., which he had also received from those companies in the ordinary course of his trade and which were used by him in buying and selling their products; that the terms and conditions shown in the pricelists (plaintiff's exhibits 4–7) had not changed during all the time he had been active in this field, except that additional sizes of sheets had been offered.

With reference to the pricelists, Mr. Chetwood stated that he dealt every day with them, placing about one order a week with each of the manufacturers, and that it was necessary for him to understand the terms in order to deal with the manufacturers. We referred to the following language in the Rohm & Haas pricelist (plaintiff's exhibit 4):

Plexiglas G/GM sheets up to and including .500″ thick *will be a minimum of 2.5% larger than the nominal sizes listed* and when heated they will shrink approximately 2% in length and width. * * * [Emphasis supplied by witness.]

He testified that, when a sheet 48 by 72 inches is ordered, the sheet "would measure about 50 to 51 inches by 73 or 74 inches." He further testified that acrylic sheets were *always purchased* from Rohm & Haas and other domestic manufacturers in the United States *by thickness and by nominal size* (linear dimension, such as 48 by 72 inches), rather than by weight; and that, to his knowledge, this merchandise is also sold on a nominal square-foot basis in Japan, in England, and in Ireland.

He further testified with respect to plaintiff's exhibit 5, the pricelist of Cast Optics Corp., that the importance of the language:

UNTRIMMED—Sheets are available untrimmed with a minimum of 2″ overage on each dimension. However, some sheets may be as much as 4″ over on length. * * *

is reflected in the fact that, when he ordered a 48- by 72-inch sheet from Cast Optics, he expected the sheet to measure 51½ to 52 inches by 74 or 75 inches.

He further explained that the statement in plaintiff's exhibit 6, the pricelist of American Cyanamid Co., reading:

* * * General Purpose ACRYLITE sheets are supplied with gasket removed, with minimum of 3½% over nominal size listed.

was language on which he (and the trade generally) relied in making purchases from American Cyanamid Co., and that the representations as to size had proven to be true, in his experience.

With respect to plaintiff's exhibit 7, the pricelist of The Poly-Cast Corp., Mr. Chetwood testified that the language:

Standard Grade (G) is normally supplied unmasked, untrimmed, and not preshrunk. Untrimmed sheets are 2 +″ greater in each linear dimension than the nominal size.

constituted a representation to the trade of the size of the sheets which could also be relied upon in dealing in this commodity.

Mr. Chetwood testified that *all this acrylic merchandise has been sold on the basis of nominal size* from the outset. During the past 5 or 6 years, the manufacturers have generally increased the overage areas, because the sheets are not perfectly straight; the manufacturers guarantee only that the purchaser will receive the nominal size sheet after the overage and unusable portion has been cut off. He testified that the overage, which he defined as "that material that is over the nominal size given," is scrapped in the utilization of the acrylic sheets.

He testified that the exact amount of overage could be determined by measuring each sheet; while the amount of overage present, as determined by the manufacturer, is generally accepted in the trade, there is an exact method of determining the weight of nominal sizes of Shinkolite or Plexiglas sheets, i. e., the specific gravity method of determining how many pounds the methyl methacrylate weighs per square foot per thickness; the pricelists set out a thickness tolerance of the Plexiglas (or other acrylic sheets) and give the thicknesses and the weight per square foot of each thickness; by taking a micrometer and measuring the thickness and utilizing the applicable lists, the weight may be determined quite simply; the tables and the pricelists, which set forth the weights per square foot of each thickness, are accepted in the trade throughout the United States and the rest of the world.

Mr. Chetwood testified that, in his opinion, the pound-per-square-foot method of determining the weight of the nominal sheet described above is the most accurate method; futhermore, this method does not require that the nominal sheet be physically isolated from the overage; if a sheet with overage was actually weighed on a scale, the overage would necessarily be included in the weight of the sheet, because in its condition as imported, the overage portion cannot be detached and separately weighed; the merchandise is *sold only by nominal measurement* per square foot on the nominal size, and "thrown in" is the overage (offal), which is discarded as the sheets are used.

The witness stated that the merchandise was bought and sold in Japan in the nominal sheet size. Referring to plaintiff's illustrative exhibit 5, he explained the meaning of certain words underlined therein.

UNTRIMMED—Sheets are available untrimmed *with a minimum of 2" overage on each dimension.* However, *some sheets may be as much as 4" over the length.* * * * [Emphasis supplied by witness.]

He would order only in the nominal size. For instance, a 48- by 72-inch sheet would normally come close to 4 inches on the overage and would measure around 51½ to 52 by 74 or 75 inches. He stated: "Overage is normally that material that is over the nominal size given" and is later scrapped. Merchandise such as exhibit 3 is bought and sold by measurement in square feet and not by weight, and the overage is included in the price. Concerning this overage, the witness stated, "Certain customers must have oversize for clamping material." Plaintiff's illustrative exhibit 6, as marked, indicates a "minimum of 3½% over nominal size listed" for Acrylite sheets; plaintiff's illustrative exhibit 7, as marked, indicates "2 +" greater in each linear dimension than the nominal size," although the witness said he never purchased this directly.

The witness further testified that the largest class of users of the imported Shinkolite material in the United States are the sign manufacturers located in almost all cities of 2,000 or more people. They make illuminated signs on a custom-made basis or on a production basis; approximately 60 percent of acrylic signs are custom-made, and 40 percent are formed on a production basis. In the custom-made signs, the overage is trimmed off and eliminated and scrapped immediately after the signs are formed. When the imported Shinkolite sheets arrived in the United States, he did not know the manner in which the sheets would be used by the customer in making signs, but he would learn the contemplated use from the customer to whom he was selling it.

In making formed signs, the production sign people normally take clear material, heat it in an oven to 350 or 400 degrees for 8 to 12 minutes, depending on its thickness, put it between clamps, and blow it into the desired shape; that 1 to 2 inches of edging (overage) is held within the clamps; that, while the clamps could hold onto the nominal size of the sheet, this is not practical because the sign manufacturers buy all their materi-

als in 12-inch multiples and must keep them in such multiples. After the forming, they trim off the overage, paint or silkscreen on the backside, and put them into a sign box or "can" that is illuminated on the inside so that both day and night identification can be had; that, in this use, the overage becomes the area which is used to clamp the material in place while the sign is being manufactured; the overage portion is cut off, trimmed off, and scrapped or thrown away. The type of signs made of Plexiglas are illustrated in plaintiff's illustrative exhibit 8 (the back cover of the Rohm & Haas Reporter) and that Shinkolite was similarly used. The entire surfaces of the signs for "Fashion Square," "Seasons Cafeteria," "Signal Hills," "Durrants Furniture," "Plaza Lanes," and "Phillips Drive-In," illustrated in plaintiff's exhibit 8, were made of acrylic sheets.

Mr. Chetwood testified that, in manufacturing flat-face signs, the material is ordered by the nominal size, such as 4 by 6 feet or 42 by 72 inches or more, but the actual sizes of the Shinkolite sheets delivered for that purpose will exceed those measurements. The sheet is normally cut to the size of the "can" or frame into which it is going, and is normally kept in 12-inch multiples for commercial convenience; that the outside of the metal frame would exceed the actual size of the sign in its finished condition. After the tubing, lighting, ballast and wiring have been added, the sheet sign is held in place by the lip of an L-shaped metal piece (facing), which is all around the sign; that it cannot be connected in any other manner because allowance must be made for expansion and contraction of the sheet according to weather conditions.

Mr. Chetwood testified that he was familiar with the fact that very little of the imported Shinkolite was used in the aircraft industry; that the bulk of it, probably 99 percent, was used in the sign industry; that, while most aircrafts use Plexiglas, he was not too familiar with the uses and methods of manufacturing this material for airplanes because it was generally done in restricted areas. He had, however, seen airplane canopies formed and aircraft windows manufactured, and knew that the thickness of sheets used in that industry varied from $\frac{1}{16}$ of an inch to 1 inch.

Plaintiff's second witness, Mr. Alphonse J. Fournier, a customs liquidator at the port of Los Angeles, testified regarding the manner in which the dutiable weights of the Shinkolite or other acrylic sheets were determined at the time of liquidation of such entries at Los Angeles. He testified that the liquidator, upon receiving an invoice of such merchandise, would look at the weights shown thereon; that the actual weight of one or more sheets of the Shinkolite or other acrylic sheets would be indicated in red ink by the examiner or appraiser; that, ordinarily, the invoice would also set out the invoiced net weight with overage and the invoiced net weight without overage; that through tests, the customs officials had determined that the net weight without overage was based on nominal area at so many pounds per square foot; that, through tests made by an inspector weighing sheets of the merchandise, it had been determined that the gross weight of an individual sheet of Shinkolite exceeded its net weight with overage by approximately 2 percent; the 2 percent consisted of the polyvinyl chloride gaskets closely bonded to the edge of each sheet to protect the sheet when standing on edge or in movement, and the masking paper adhering to the surface to prevent scratching thereof. Based on this information and in accordance with a Bureau ruling (C.I.E. 1357/63), the Bureau of Customs adopted the practice of taking the invoiced net weight with overage and making a 2 percent allowance, in the nature of a tare, for the polyvinyl chloride gasket and the masking paper. It had also been determined that the acrylic sheets exceed the invoiced nominal sizes by anywhere from $\frac{1}{2}$ inch to 2 inches; that said excess, which

surrounds the sheet entirely, constitutes the overage.

The foregoing record in this case presents the issue clearly and concisely. There is no controversy over the facts. Paragraph 31(a)(1) of the Tariff Act of 1930, as modified, supra, under which the imported acrylic sheets were classified, admittedly is applicable. It is plain and unambiguous, and provides that the merchandise herein is dutiable at the rate of 19 cents per pound. Construction of the words of the statute is not in question.

We are asked by the plaintiff, however, in effect, to ignore the aforesaid provision of the tariff act calling for the assessment of duty at 19 cents per pound by actual weight of the importation, plaintiff's counsel arguing:

> * * * only the tariff talks in terms of the weight of acrylic sheets. The trade is uniform in dealing with such merchandise in terms of nominal linear dimensions [Plaintiff's brief, page 12.]

■ We note, therefore, sharp disapproval by the plaintiff of the manner in which the statute provides for acrylic sheets, and urges its own method of dutiable measurement—square foot measurement based on custom in the trade. We cannot accept an alleged trade custom to override a plain and unambiguous provision of the tariff act.

Plaintiff cites United States v. Thomson, 2 Ct.Cust.Appls. 76, T.D. 31630, and F. W. Myers & Co. v. United States, 19 Treas.Dec. 1008, Abstract 24037, in support of its argument that custom in the trade is recognized in certain situations. Both cited cases involved the measurement of merchantable thickness of lumber. The cases are not representative of the instant situation. We are concerned here with the actual weight of acrylic sheets as imported. The statute makes no provision for overage or extras. If Congress had intended any such exceptions as the plaintiff here claims, it would have been a simple matter to so provide. The Congress did not do so, and it is not within the province of our court to read such words of exception into a simple, understandable statute.

In Murray Block, Temporary Administrator for Estate of Louis S. Fryer v. United States, 32 Cust.Ct. 131, C.D. 1594, affirmed, 42 CCPA 217, C.A.D. 596, which is cited by the defendant, numerous authorities are afforded in support of the principle that actual weight of imported merchandise is the realistic weight and shall govern as against a theoretical weight known by a custom in the trade.

The issue presented therein was whether certain rayon yarn, singles, was dutiable upon the basis of its weight as established by commercial usage. The collector found that the yarn weighed less than 150 deniers per length of 450 meters, by actual weight, and levied duty accordingly at the applicable rate under the provisions of paragraph 1301 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade (T.D. 51802). Plaintiff claimed that the yarn was properly dutiable under paragraph 1301, as modified, supra, at the rate applicable to yarn weighing 150 deniers or more per length of 450 meters.

The testimony of plaintiff's witnesses established that, in the trade and commerce, a purchaser of 150-denier yarn would not reject it because the yarn weighed only 145 deniers; that a purchaser would expect to get yarn weighing approximately 142 deniers if he ordered 150-denier continuous process yarn; that, for many years, yarn had been sold, billed, and shipped as 150-denier yarn, but 150-denier yarn had not been delivered, and there never had been a complaint; that rayon yarn was purchased by denier classification or specification as 50-, 75-, 100-, 120-, 150-, and 450-denier yarn and had never been purchased or designated as 138-, 142-, 145-, or 151-denier yarn, and that the former designations had been used since the beginning of the rayon industry.

On the basis of the foregoing testimony, this court stated (page 134):

There is little if any, dispute between the parties regarding the facts in this case, and the record fully justifies a holding that in trade and commerce, in dealing with such or similar merchandise, a trade tolerance or allowance is always expected and made between the buyer and seller and that this has been true for a long period of time. If this trade tolerance or allowance be accepted in this case, the plaintiff is entitled to prevail.

It is our view that the language of said paragraph 1301 of the Tariff Act of 1930, as modified, supra, is clear, plain, and unambiguous and that there is little, if any, room for construction. The line of demarcation is between yarns of rayon, weighing 150 deniers or more per length of 450 meters, and yarns of rayon, weighing less than 150 deniers per length of 450 meters. This is not a case in which there is room for the application of the rule giving force to commercial usage. Had it been the intention of the trade negotiators to make this merchandise dutiable according to the rule of commercial usage, it would have been an easy matter for them to have so stated. This they did not do.

Notwithstanding the practice in the trade, the court overruled the protest and sustained the collector's classification of the merchandise as yarn weighing less than 150 deniers per length of 450 meters, on the basis of its actual weight.

Again, in California Brush Co. v. United States, 73 Treas.Dec. 1221, Abstract 38208, on the issue of proper dutiable weight of certain palmyra stalks per bale, the court held that the actual weight of the merchandise when imported was the proper dutiable weight, irrespective of any trade custom otherwise by which the weight of the bales was regarded. See also Perkins Goodwin & Co. v. United States, 160 F. 272 (C.C.E.D.Pa.1908).

We must recognize that Congress, in enacting the Tariff Act of 1930, presumptively was aware of the prior court decisions holding that commercial practice was to be disregarded in determining the dutiable weight of merchandise, and that the actual weight was to be controlling. Congress could have provided that trade practice was to be recognized. It did not do so. Section 315 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1953 (T.D. 53318), provides:

SEC. 315. EFFECTIVE DATES OF RATES OF DUTY

\* \* \* \* \* \*

(c) Insofar as duties are based upon the quantity of any merchandise, such duties shall, except as provided in paragraph 813 and section 562 of this Act (relating respectively to certain beverages and to manipulating warehouses), be levied and collected upon the quantity of such merchandise at the time of its importation.

■ Applying the foregoing reasoning to the acrylic sheets before us, it is clear to us that only the actual weight, including the overage, must control. This actual weight is established and is not in dispute. The statute itself is clear and unambiguous. The overage is of the same identical material as the nominal portion, used also as clamping material. The fact that this overage is scrapped later is not significant. The weight at the time of importation governs.

We have, of course, examined all of the cases cited by the plaintiff. On close consideration, we do not find them analogous to the instant situation at all.

For instance, chicken breasts packed in gelatin (United States v. E. W. J. Hearty, Inc., 31 CCPA 106, C.A.D. 257); slices of pineapple packed in water (Peabody & Co. v. United States, 13 Ct.Cust. Appls. 80, T.D. 40935); canned ham in a gelatinous material which was discarded on removal of the ham (Axel Stokby et al. v. United States, 4 Cust.Ct. 343, C.D. 358); and further like cases wherein the packing represented tare and was not dutiable, we distinguish here. The overage in the instant case is the same

material as the nominal portion and is, in fact, part of the whole.

In the face of the clear and unambiguous provision of the statute, which is without words of exception, the principal query is merely the weight of the whole acrylic sheet. This dutiable weight we hold to be that of the nominal portion, plus the overage, as found by the collector.

The protest is, therefore, overruled.

Judgment will be rendered accordingly.

RICHARDSON, J., concurs.